IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 15-cr-00245-WJM-2

UNITED STATES OF AMERICA,

     Plaintiff,

vs.

JORDAIN LARSEN,

     Defendant.

_____

**REPORTER'S TRANSCRIPT**
(Sentencing)

_____

        Proceedings before the HONORABLE WILLIAM J. MARTÍNEZ,
Judge, United States District Court for the District of
Colorado, commencing at 2:05 p.m., on the 20th day of April,
2016, in Courtroom A801, United States Courthouse, Denver,
Colorado.

**APPEARANCES**

        Judith A. Smith, Attorney at Law, U.S. Attorney's
Office-Denver, 1225 17th Street, Suite 700, Denver, CO 80202,
appearing for the plaintiff.

        Kathryn J. Stimson, Attorney at Law, Stimson Glover
LLC, 1800 15th Street, Suite 101, Denver, CO 80202, appearing
for the defendant.

Proceeding Recorded by Mechanical Stenography, Transcription
Produced via Computer by Gwen Daniel, 901 19th Street,
Room A259, Denver, Colorado, 80294, 303.571.4084

**PROCEEDINGS**

1

2          (In open court at 2:05 p.m.)

3              THE COURT:  We are on the record in Criminal Case

4     No. 15-cr-245, Defendant No. 2, United States of America vs.

5     Jordain Larsen.

6              I will take appearances of counsel.

7              MS. SMITH:  Good afternoon, your Honor.  Judy Smith

8     appearing on behalf of the United States.  Seated with me at

9     counsel table is Special Agent Tina Fourkas with the F.B.I.

10             THE COURT:  Good afternoon to the two of you.

11             MS. STIMSON:  Good afternoon, your Honor.  Kathryn

12    Stimson appearing with Jordain Larsen, who is seated to my

13    left.

14             THE COURT:  Good afternoon to the two of you.

15             Will the probation officer please identify herself for

16    the record.

17             THE PROBATION OFFICER:  Good afternoon, your Honor.  I

18    am MariJo Paul on behalf of the Probation Office.

19             THE COURT:  Good afternoon, Ms. Paul.  Welcome.

20             All right.  Since we are going to be here quite a long

21    time this afternoon, I fear, I am not going to have,

22    Ms. Stimson, you and your client stand at the lectern all

23    afternoon.

24             So for now I am going to ask the defendant to please

25    rise and have the oath administered to her.

1          (Defendant sworn.)

2               THE COURT:  Be seated.

3               The record reflects that on the 8th of January 2016,

4     pursuant to a Plea Agreement reached with the government,

5     Ms. Larsen entered a plea of guilty to and she was convicted of

6     Counts 1, 2 and 3 of an Information charging production of

7     child pornography and aiding and abetting, in violation of 18,

8     United States Code, Sections 2251(a) and (2).

9               At that time the defendant also admitted the

10    forfeiture allegation in the Information.

11              We are here for the sentencing of the defendant.

12    Since we'll have plenty opportunity to discuss your reasons and

13    rationales and arguments for your positions later in the

14    hearing, given the defendant's motion, for now I would like

15    counsel to just briefly summarize your respective sentencing

16    recommendations.

17              Ms. Smith.

18              MS. SMITH:  Your Honor, the government is recommending

19    a sentence of 90 years' imprisonment to be followed by a

20    lifetime of supervised release.

21              THE COURT:  Thank you.

22              Ms. Stimson.

23              MS. STIMSON:  Thank you, your Honor.  I am

24    respectfully requesting a sentence of 240 months, which is 20

25    years.

1          THE COURT:  All right.  What about supervised release?

2          MS. STIMSON:  She does not object to lifetime

3     supervised release.

4          THE COURT:  All right.  I note for the record that no

5     objections have been made to the report by either the

6     government or the defendant.

7          Is there an oral motion by the government for an

8     additional one-level reduction in the offense level for

9     acceptance of responsibility?

10         MS. SMITH:  Yes, your Honor.

11         THE COURT:  All right.  There being no objection, the

12    motion is granted.

13         Is there also an oral motion by the government to

14    dismiss the Indictment?

15         MS. SMITH:  Yes, your Honor.

16         THE COURT:  All right.  Again, there being no

17    objection, the motion is granted.  The Indictment against this

18    defendant only is dismissed.

19         Given the terms of the parties' Plea Agreement, which

20    I have accepted, as well as my ruling on the government's

21    motion, I find that the total Offense Level in this case is 43.

22    The probation officer has determined that the defendant's

23    Criminal History Category is I, which yields an advisory

24    Guideline sentence of life imprisonment for each of Counts 1, 2

25    and 3, a statutory custodial period of 180 to 360 months on

1   each of these three counts, a Guideline and statutory period of

2   supervised release of five years to life, a Guideline fine

3   range of 25,000 to $250,000 and a special assessment of $300.

4         Do counsel agree that the Court has correctly

5   calculated the Guideline sentence and the statutory custodial

6   range in this case?

7         MS. SMITH:  Yes, your Honor.

8         MS. STIMSON:  Yes, your Honor.

9         THE COURT:  Thank you, counsel.

10        All right.  Let me inquire of the government:

11        Ms. Smith, do you intend to call any witnesses, make

12   any proffer or have any individuals make any statements to the

13   Court during the hearing?

14        MS. SMITH:  Your Honor, I spoke with members of the

15   family who are seated behind me, and before the sentencing they

16   remained unsure whether they wanted to address the Court.  So

17   with the Court's indulgence, at the proper time which is

18   convenient for your Honor, I can inquire of them whether they

19   wish to make a statement to the Court.

20        I don't anticipate offering up any additional evidence

21   or testimony today.

22        THE COURT:  Okay.  And no proffer of any type?

23        MS. SMITH:  No proffer, your Honor.  I will note for

24   the record, as I let Ms. Stimson be aware, although given the

25   Court's position in prior cases, I wanted the Court to know we

1    do have images available for the Court's review, but I don't

2    intend to offer them for review unless the Court wishes to view

3    them.

4            THE COURT:  No, I am not changing my position from

5    prior cases.  I think the description of the videos and images,

6    the narrative descriptions, are adequate for me to understand

7    what is depicted in them, and I don't need to actually see

8    those images.

9            All right.  If we're talking about possible statements

10   from members of the family, I would say we would probably limit

11   it to no more than three individuals and no more than five

12   minutes from each one.  I will give you an opportunity at the

13   appropriate time to consult with the members.

14           And the members of the family that are here in the

15   gallery, if you are thinking of making a statement, you should

16   be collecting your thoughts and making a decision to be able to

17   convey to Ms. Smith, when she asks you, so that we can make

18   this a more efficient portion of the hearing.

19           All right.  For the defendant, does the defendant --

20   Ms. Stimson, do you anticipate putting on any evidence, any

21   proffer or any statement being made by anyone on behalf of the

22   defendant?

23           MS. STIMSON:  No, your Honor.

24           THE COURT:  All right.  Thank you.

25           So at this point we will turn to argument on the

1   defendant's motion for a downward variant sentence, ECF 67.

2           Ms. Stimson, if you could take the lectern.

3           MS. STIMSON:  Thank you, your Honor.

4           This case is an horrific tragedy, by all accounts.

5   And I think that the Court has an incredibly difficult job

6   today.  What is this horrific tragedy worth.

7           I have spent the last approximately year thinking

8   about that myself.  I don't believe that this is a 15-year

9   case.  I don't believe it's a 16-year case, a 17-year case.

10  But it also is not worth a life sentence.

11          Putting the death penalty aside, a life sentence is

12  the most severe and harsh sentence that the criminal justice

13  system in this country offers or has.  As a former public

14  defender for seven years, I have unfortunately stood at this

15  podium next to people who have gotten life sentences here and

16  in state court, primarily state court.

17          THE COURT:  First, let me understand what you are

18  saying.

19          MS. STIMSON:  Yes.

20          THE COURT:  The government is seeking a sentence of 90

21  years, not life imprisonment; but you are saying given your

22  client's age of 27 that the government is effectively seeking a

23  life sentence.

24          MS. STIMSON:  That's correct, yes.

25          THE COURT:  Ninety years.  And if she were to get the

1    full 15 percent reduction for good behavior, 15 percent of 90

2    would be 13 and a half, so that would be -- have you calculated

3    that?

4           MS. STIMSON:  She would be approximately 100 or over

5    100 years old.

6           THE COURT:  All right.

7           MS. STIMSON:  So I have concluded that it's a life

8    sentence.

9           THE COURT:  Okay.  Just so we're clear on the record,

10   because it's not technically what the government is seeking,

11   but effectively we're speaking of a life sentence.

12          MS. STIMSON:  Yes.  Ninety years in prison is -- you

13   know, for Ms. Larsen, would be effectively a life sentence.  So

14   that is what I mean.

15          And so that's why I think when we look at what is a

16   life sentence, be it actual life or 90 years, for someone in

17   their mid 20s, is she warranted -- is this case warranting of

18   the worst of the worst of the worst that we have in the

19   country; and, you know, mass murderers, serial rapists, even

20   after deliberation, premeditated murderers get that sentence.

21          And while I agree this is an horrific tragedy, I don't

22   think that the crime or the person here, Ms. Larsen, rises to

23   that level of setting herself out as being the worst of the

24   worst of the worst.

25          I submitted a lengthy psych evaluation for this

1    Court's review, and I don't intend to go into that and repeat

2    all of that.  I focused on some of it in my motion, and it was

3    over 20 pages, and I think very thorough.

4            Instead, I wanted to focus the Court on something the

5    Court hasn't heard much about with respect to Ms. Larsen, and

6    that is her tremendous remorse for all of this.  The first

7    three months, approximately, that I represented her, she was

8    unable to carry on any kind of conversation with me, because

9    she couldn't talk through all of her heavy crying.  She

10   attempted suicide during that time period as well, was held on

11   a suicide watch, a special cell, for a time period.

12           As time went on she began to accept the pain that she

13   has caused all of the people sitting behind me in this room as

14   well as the small children that were most important to her in

15   this world.  And the fact that she's able to accept that, that

16   she caused that damage, that she has caused tremendous pain to

17   all of these people, and that that's her fault, is something

18   that she's going to tell the Court more about.

19           And I think that it is remarkable that she's able to,

20   after a year, accept that; and I think it's the first step to

21   her being able to move into a healing and changing place that

22   she can do in prison.

23           If she were here today and hadn't accepted that level

24   and degree of responsibility for all of this, I think that

25   argument for a life sentence, or effectively a life sentence,

1   would be perhaps a better one.  But she has not only accepted

2   her role in all of this, but has been taking every possible

3   opportunity that there is within the jail setting to better

4   understand herself and the brokenness that she is, to be able

5   to move forward and be a healthier person.

6        The psych evaluation that I submitted includes all of

7   the treatment that she has started.  And it's the jail

8   psychologist's opinion that she is really remorseful.  And that

9   isn't coming from a place of, I was caught and therefore I am

10  remorseful, it is a true remorse, based on the opinion of that

11  jail psychologist.

12        THE COURT:  You want to hand the tissue box that's

13  next to you to your client.

14        MS. STIMSON:  Thank you, your Honor.

15        THE COURT:  Let me ask you about Dr. Schneider's

16  report.  How do you respond to the government's position and

17  its response to your motion that in great measure that report

18  is simply a recitation of the defendant's view of the events

19  and her rationales and her explanations and her defenses?

20        Because beyond speaking to her and her ex-boyfriend,

21  Dr. Schneider did not review any of the discovery in this case,

22  did not review, you know, any of the snapshot communications,

23  the text messages, did not speak to any of the family members.

24        So she got a very decidedly one-sided version of the

25  events and, effectively, just restated the defendant's

1    positions in more polished, professional psychologist language.

2           What's your response to that?

3           MS. STIMSON:  Your Honor, my response to that is I

4    would point to page 4 of the addendum that includes the report.

5    And on page 4 it lists the sources of information that

6    Dr. Schneider did review.  There's a list of 22 items that she

7    reviewed.  Lots of those include conversations with me, but

8    taking those out, she reviewed the therapy notes from the Clear

9    Creek County Jail as well as the Douglas County Jail.  She

10   spoke with Ms. Regina Heck, who is a therapist at the Clear

11   Creek County Jail.  She reviewed all of the documents produced

12   by the F.B.I. in this case that were provided to me in

13   discovery.

14          THE COURT:  She doesn't -- I mean here's what I am

15   getting at, that she spends a lot of time in her report talking

16   about how in her view your client did what she did, in part

17   because she felt threatened by Mr. Holt and concerns about what

18   might happen to her if she didn't go along with his plans.

19          But I agree with the government, if you review the

20   text messages and the Snapchats, I do not see any evidence that

21   your client had a reasonable fear of any physical harm

22   happening to her as a result of Mr. Holt.

23          So if she did review them she surely -- she didn't

24   take your client's statements and then contrast them with the

25   evidence that she had in front of her.

1          MS. STIMSON:  She -- I don't know how -- I mean

2     without going back and pulling out specific parts of her

3     report, you know, that's over 20 pages long, I guess my

4     response to the Court is she interviewed Ms. Larsen, and

5     Ms. Larsen told her things in the interview that weren't

6     included in discovery, that weren't included in the text

7     messages.  Certainly Mr. Holt and Ms. Larsen had a lot of

8     communications that weren't documented.  I don't think that

9     Dr. Schneider focuses largely on that as a basis --

10         THE COURT:  I didn't say "largely," I said "in part."

11    She did focus in great part, as some kind of explanation for

12    your client's conduct, that she desperately wanted Mr. Holt in

13    her life, and wanted to keep him in her life, and saw that the

14    children were a way to do that, and in a way to allow those of

15    us who are having difficulty just comprehending these acts, at

16    least to just understand what might have motivated Ms. Larsen.

17         MS. STIMSON:  I would ask the Court not to focus on

18    the "she was threatened."  I am not going to assert that today.

19    I didn't in my 3553(a) motion.  She's not going to say it.  She

20    doesn't think that Mr. Holt held a gun to her head and forced

21    her to do this.  That is not her position at all.

22         THE COURT:  It would have been difficult to do from

23    1800 miles.

24         MS. STIMSON:  Absolutely.  And that's why I am not

25    talking about it today and why I didn't raise it in my 3553(a)

1    motion either.

2            THE COURT:  Well, then why don't you address what

3    Dr. Schneider does focus on in significant portions of her

4    report, that your client is a needy individual with a history

5    of -- what she asserts now is a history of abuse, although

6    there's no contemporaneous record of this abuse at the time

7    that it was alleged to have occurred, and that this neediness

8    manifested itself in great part by using the children as bait

9    to keep Mr. Holt in her life.  So why don't you address that

10   and how I should consider that in my sentencing determinations

11   under Section 3553(a).

12           MS. STIMSON:  I think that Ms. Larsen had a difficult

13   life.  I think that her brother made statements to the

14   Probation Department that corroborate that she was sexually

15   molested by a family member when she was young.  He knew about

16   that at the time that it happened.  She attempted to commit

17   suicide when she was a young teen-ager.

18           When the probation officer asked her mother about that

19   event, her mother didn't remember that her own teenage daughter

20   had attempted suicide until she was:  Oh, that's right, the

21   time she went in the ambulance.

22           She clearly had an unhealthy way of seeing herself

23   that was if she got pregnant, that that somehow made her more

24   valuable or gave her more self worth.  And she would have

25   repeated miscarriages as a young teen-ager that she would deal

 1   with on her own.  Adult mentally healthy women who have

 2   miscarriages have difficulty dealing with that.  Insecure

 3   previously sexually abused 13-year-olds who attempt a suicide

 4   dealing with a miscarriage, it's incredibly tragic.

 5        She has had abusive relationship, after abusive

 6   relationship, after abusive relationship with men.

 7        It wasn't my intent today, your Honor, to speak

 8   negatively about the people who are in this courtroom, because

 9   I am not sure that that gets us anywhere, which is why I

10   submitted the psych eval and wasn't planning on talking about

11   it a lot today, because I think that they've already undergone

12   a lot of pain.  And Ms. Larsen understands that they have

13   already undergone a lot of pain.  It could be said, and I agree

14   with it, there are a lot of people who have undergone a lot of

15   bad things in their teenage years and don't go on to do this.

16   So that's another reason I wasn't planning on focusing on it

17   today.

18        But did she have a good life?  Absolutely not.  Did

19   she have a healthy upbringing?  Absolutely not.  Did she ever

20   feel like anybody ever loved her or feel good about herself?

21   Absolutely not.

22        Now does that make this okay?  No, it doesn't either.

23   But when 3553(a) calls for the history and characteristics of

24   the defendant, I think that that stuff is important.  And she

25   isn't a sociopath who tortured animals as a young child and,

```
 1    you know, has no remorse for anything and doesn't think she did

 2    anything wrong.  She's not that person.  She's an incredibly,

 3    incredibly broken person.  And she's an incredibly broken

 4    person who clearly has a disconnect with what it means as a

 5    mother to protect your children.

 6           And I am not a psychologist, but it seems to me like

 7    she never felt that love and what it was like to be protected

 8    by her mother or father when she was growing up.  She never saw

 9    that, never felt that.  And that's how that cycle repeats

10    itself.

11           THE COURT:  Well, I definitely understand what you are

12    saying, but I can't view the history and characteristics of the

13    defendant as a 3553(a) factor in the abstract, I have to

14    connect it to the crime.

15           MS. STIMSON:  Uh-huh.

16           THE COURT:  And sometimes the history and

17    characteristics of the defendant, in my mind, much more readily

18    explain, at least -- not condone, explain the criminal conduct.

19           For example, a child who is raised by parents who use

20    controlled substances, illegal drugs, and is introduced to

21    drugs as a child, and then gross up and then starts possessing

22    and distributing drugs; it's not going to make that conduct

23    legal, it's not going to condone it, but I can understand it.

24    All right?

25           MS. STIMSON:  Uh-huh.
```

1          THE COURT:  You're asking me to make a far greater

2    leap.  All right?  This can be, as we all know, a cruel world,

3    and there are a lot of people out there that have been bullied,

4    that have been ostracized, that have been taunted, men and

5    women who have been sexually touched or molested, but who then

6    do not turn around and sexually molest and abuse their own

7    children, their nephew, and then allow them to be used by

8    another individual.

9          MS. STIMSON:  I agree one hundred percent with the

10   Court.  I agree one hundred percent.  But in seeking to figure

11   out how did this happen -- because she's not a monster.  I have

12   spent a tremendous amount of time visiting her at Clear Creek

13   Jail and Douglas County Jail, talking with her, working through

14   her acceptance of the fact that she did this.

15         And she is not a monster.  She is a broken person, an

16   incredibly broken person.  And how did this happen is what I

17   was looking for in talking to Dr. Schneider.  And I wish that I

18   could tell the Court exactly how someone does this, that we get

19   here, and I don't -- I don't have that exact answer.  I don't.

20   And that's not for lack of searching.  But that doesn't mean

21   she's a monster because I haven't figured that out.

22         I think Dr. Schneider, in talking with me, and she

23   does express it briefly in her report, it happens all the time

24   that mothers and women put other things ahead of their children

25   to the detriment of their children, be it an addiction to

1    methamphetamine, a physically abusive boyfriend, that happens

2    regularly.  And we don't look at the methamphetamine addicted

3    mother who left her kids on the street as the monster that we

4    look at her as or people are in this room looking at her as.

5         And the psychologist explained to me that we can't

6    underestimate the power of someone who wants to feel love,

7    wants to feel attention, wants to have a man in their life.

8         I think her family members expressed to the Probation

9    Department, you know, that she always wanted to have a man in

10   her life; and that that, in the psychologist's, you know,

11   report, was her addiction.  It wasn't the methamphetamine that

12   we see in other cases, it wasn't other things.  That was what

13   she wanted more than anything.  Which then makes it be that if

14   there wasn't this man who existed in the world who was seeking

15   out a woman who would let him do this, or who would allow him

16   to do this or invite him to do this, if you will, she wouldn't

17   be here.

18        She wasn't the pedophile seeking out for all of this

19   to happen.  And I say that not to diminish her role, because

20   she absolutely had a huge role in this, absolutely.  But she

21   didn't go out in the world and try to do this the way that her

22   codefendant did.

23        And, yes, she should have stopped it; yes, it never

24   should have happened.  And I wish there was an explanation, but

25   I think some cases, and this is one of them, there isn't this

1    perfect explanation.

2            I do think that her life history shows that she was

3    incredibly, incredibly insecure, and had never felt love in her

4    life; and that's what she was seeking, you know, and would

5    sacrifice all for that.

6            THE COURT:  Including her children?

7            MS. STIMSON:  Obviously.

8            THE COURT:  Go ahead.

9            MS. STIMSON:  She did use her children to get this man

10    to come and be with her.  That said, she was not the primary

11    perpetrator in this case.  She was not the primary perpetrator

12    of the abuse.

13            I have seen, unfortunately, all of the videos, and she

14    absolutely was not the primary perpetrator, which distinguishes

15    her from the codefendant, it distinguishes her from other

16    defendants charged with this type of crime and distinguishes

17    her from the worst of the worst of the worst that we see in

18    society.  Because I reviewed the -- as much as was publicly

19    available in other cases that this Court has handled that were

20    similar, as I discussed in my 3553(a) motion.  And I arrived at

21    my request of 240 months, or 20 years, after thinking about

22    those cases and her case and her role and the level of abuse

23    and all of those factors.

24            She was not the primary perpetrator.  She did at the

25    beginning, and then she allowed it to happen.  And what she did

1    at the beginning was -- and, you know, in discussing this in

2    the context of all of this, it's all terrible, but her level of

3    perpetrating abuse was very minimal in comparison to the -- you

4    know, in the spectrum of abuse.

5            THE COURT:  Well, I don't know exactly what you are

6    arguing.  If you are saying that your client did not sexually

7    assault the children with the frequency and the brutal manner

8    in which the codefendant did, I will grant you that.

9            MS. STIMSON:  Yes, that's what I am asserting.

10           THE COURT:  Okay.  But you are just making a relative

11   point.

12           MS. STIMSON:  And that's why -- yeah.

13           THE COURT:  But I am sentencing her for her conduct,

14   and she herself wasn't just an enabler here, she herself

15   engaged in the sexual abusive acts on the children.

16           MS. STIMSON:  She sexually abused her son.  She did

17   not sexually abuse her daughter.

18           THE COURT:  Abuse her daughter or her nephew.

19           MS. STIMSON:  Or her nephew.

20           THE COURT:  All right.

21           MS. STIMSON:  So, again, this is all --

22           THE COURT:  But this is not the case where someone was

23   the bystander and filmed and photographed while someone else

24   did the sexual assaults.  She sexually -- it's just hard for me

25   to talk about this.  She sexually molested her two-year-old

1    son.

2              MS. STIMSON:  I know.

3              THE COURT:  A mother doing that to her little boy,

4    performing oral sex on him, digitally penetrating him, fondling

5    his genitals, that's sexual assault on a two -- not a

6    14-year-old, a two-year-old in diapers.

7              MS. STIMSON:  I know, your Honor.  And that's why I

8    have -- it hasn't been many days in my life where I filed a

9    motion asking for 240 months, asking for the Court to give

10   someone 20 years.  That's the reason I am asking for that,

11   because that's very bad, and that is not lost on me or

12   Ms. Larsen.  And the very terrible place where we find

13   ourselves in in this case is, well, where is it, between 15 and

14   90 years, where is this.

15             And in other cases people who have done that same

16   thing got 21 years.  Other people have -- you know, I think

17   that you look at number of victims, number of times, types of

18   abuse.  And it's arguable whether she filmed the abuse or

19   didn't film the abuse.  In my review of the videos it doesn't

20   look like another person is filming it, it looks like he's

21   filming himself because of the way the camera angle is.  Same

22   with the bathtub incident.  It doesn't look like another person

23   is filming it, it looks like it's being self-filmed.  But I

24   don't know that we know that.  But that's obviously bad as

25   well.  Which is, again, why I'm asking for 20 years, because in

1   the scheme of all of it, I think that is what it's worth.  It

2   is not a life sentence case.

3        Thank God the children are in treatment and are

4   getting help.  She will never be able to have contact again

5   with them ever.  She hasn't had any contact with them since

6   they have been -- you know, since she has been in custody.

7   She's a person who has never been in custody before in her life

8   or had any kind of issue like this in her life.

9        She is remorseful.  She's soaking up all the treatment

10  that she can possibly get.  She's lost everyone in her life,

11  all of these people back here -- by the way, Dr. Schneider

12  attempted to reach several of them, and they refused to speak

13  with her, which has been the case with me as well.  And I don't

14  blame them for that, but that I think is why Dr. Schneider

15  didn't talk to them.  But also punishment for her.  The fact

16  that she's forfeited her right to be a mother is huge

17  punishment for her; that she will never spend another moment

18  with her kids, huge punishment; that her entire family hates

19  her.  She will go alone to a different state, to a federal

20  prison.  No one will write her, no one will visit her, no one

21  will call her.  And 20 years being locked in there by herself

22  is sufficient.

23        THE COURT:  Let me ask you:  Obviously, if the three

24  victims had been the children of the neighbor across the

25  street, this would still be an horrific federal crime.  How, if

1    at all, in your view should I take into account as a sentencing

2    consideration under 3553(a) that this was done to the

3    defendant's two children and nephew?

4           MS. STIMSON:  Is that aggravating or mitigating in

5    comparison to the neighbor's?

6           THE COURT:  How should I factor that into the

7    constellation of factors I have to balance and weigh when

8    coming up with what I believe is the just sentence in this

9    case?

10          MS. STIMSON:  I think that -- I don't have a great

11   answer for the Court with respect to that.  I think it can be

12   seen either way.  Same with the age of the children.  I think

13   that -- you know, it feels terrible how young they were, but on

14   the other hand, they won't have the visual memories, hopefully,

15   that older children would have.

16          THE COURT:  We hope that.  I don't know that anyone in

17   this room can know that for a fact.

18          MS. STIMSON:  No, no.  I think the older daughter,

19   however, was not victimized nearly to the extent of the other

20   two.  Some photographs were taken of her.

21          THE COURT:  Thankfully it appears that she was just,

22   using air quotes, just photographed, that Mr. Holt was not

23   interested in her, but in the two boys.

24          MS. STIMSON:  Yes.

25          THE COURT:  So are you saying it's a neutral factor,

1    it doesn't aggravate or mitigate?

2          MS. STIMSON:  Yes.

3          THE COURT:  What about the deception and the fraud

4    that the defendant used on more occasions with her brother and

5    her brother's family to lure her nephew into her home to allow

6    this boy to be accessible to Mr. Holt?  How should I factor in

7    the fact that she used this deception, you know, telling them

8    that she wanted him to come over for sleepovers with his

9    cousins, knowing, knowing that she was going to put him

10   directly into harm's way, and but for her conduct that little

11   boy would never have been in that house and never have been

12   victimized by Mr. Holt?

13         MS. STIMSON:  I think that that goes into the same --

14   I mean that's why I am asking this Court for 240 months,

15   because I am not going to stand here and say that that isn't

16   bad.  Yes, it is.  And I think that Mr. Holt, you know, was the

17   abuser.  Mr. Holt was interested in young boys, she wasn't.

18   She wasn't abusing them.  But she was making them available,

19   and that is worth 20 years in prison.  Twenty years is not a

20   small sentence --

21         THE COURT:  I understand that.  I get that.

22         MS. STIMSON:  -- at all.  And either is lifetime

23   supervised release.  She will be -- she will have to register

24   as a sex offender because of this case.  There's nothing to

25   suggest that she has these pedophilic interests, so we don't

1    have that concern that we have in other cases that the person

2    is going to get out and could -- you know, would be after

3    children again, because her circumstances are different.  And

4    that is mitigating, that she will go through treatment.  When

5    she gets out she will be way past the age to have children and

6    won't be -- it won't be a risk to society being on lifetime

7    supervised release.  I mean that's incredibly rigorous and

8    difficult to comply with day to day.  And she will be

9    absolutely watched.

10           And I think 20 years accomplishes the 3553(a) goals in

11    terms of punishment, removing her from society for this huge

12    time period, deterrence, but then it also isn't greater than

13    necessary, because she can reenter society, and with something

14    in place like lifetime supervised release, we don't -- and not

15    having -- you know, the supervised release officer will know

16    the history of this and I would imagine check every

17    relationship, or attempt to, every relationship that she ever

18    has.  And single, without children and without children near

19    her, which would be terms and conditions of her supervised

20    release, she doesn't have that threat to the community that we

21    see in many other cases.

22           So it's incredibly hard.  And the Court has raised the

23    issues that are incredibly hard.  But I go back to what I've

24    said a lot of times already, that 20 years is a very, very big

25    prison sentence.  And she will go alone, without anyone, and

1   serve those 20 years; and that is a dramatic, severe

2   punishment.

3          THE COURT:  All right.  Thank you, Ms. Stimson.

4          Ms. Smith, I will hear from the government in response

5   to the motion.

6          MS. SMITH:  Your Honor, if the Court imposes a

7   sentence of 20 years, she will be out when she's 44.  The

8   government is asking for what is essentially a life sentence.

9   And the kids and their family members who sit on the side of

10  the United States because of -- unlike in many cases, and

11  including the ones in front of your Honor has seen, the family

12  rallies around the support for the offender, not the children.

13  And thank goodness in this case the family has rallied around

14  these children and not the offender.

15         It's a unique circumstance because it bodes well for

16  their future.  Nevertheless, those kids and that family --

17  those family members, they are serving a life sentence.

18  Ms. Larsen didn't just make her kids available to someone whom

19  she knew wanted to have sex with her children.  Within two

20  months of meeting him she produced images, videos of child

21  pornography on Skype, which is, as the Court knows, a live

22  video interface.  And while she was doing that she was

23  chatting, and those chats were captured in both her computer

24  and that of Mr. Holt's.

25         In contrast to the statements that Ms. Holt makes to

1    the psychologist, they show a picture of a woman who puts her

2    needs, her own sexual needs above the mental, physical and

3    emotional well-being of her children.  Not only did she do

4    that, she strongly encouraged Mr. Holt to move to Colorado

5    where he would have nonstop access to her children.  And while

6    she lied to law enforcement during the interview to say that

7    she had been threatened, she lied, in the government's view, to

8    the psychologist about having been threatened, and that story

9    continued.

10            It's that picture of:  It's not my fault.  She even

11   said during her interview to Special Agent Fourkas and

12   Special Agent Vanicelli:  I didn't tell anybody because they

13   would make it all like it's my fault.

14            Well, I submit to the Court that if Ms. Larsen had

15   simply turned off her computer, these children would never have

16   been victimized.

17            Now would Mr. Holt have gone on to victimize other

18   children?  Probably.  But these children would never have been

19   touched, certainly not by their own mother, the person that's

20   supposed to protect them.  That's supposed to be hard-wired to

21   protect them, as her sister pointed out, but didn't.

22            In terms of the difficult upbringing, your Honor, I --

23   we've all been doing this a long time and we've all heard about

24   difficult childhoods.  And as the probation officer pointed

25   out, Ms. Larsen paints a picture of her childhood that even the

1    probation officer says is, quote, unquote, questionable.

2           In the courtroom is Ms. Larsen's brother, sister,

3    father, mother and grandmother.  And when the probation officer

4    spoke with each of them, the allegations of sexual abuse by

5    Ms. Larsen were that she was abused by an uncle and that she

6    was abused by a classmate when she was in middle school.

7           When her brother was asked about it, her brother said:

8    Yes, she told me about that.  She said that her uncle tried to

9    get her to flash him, meaning her breasts.  And she also

10   reports to the probation officer that she was grabbed at her

11   bottom and breasts during classes.

12          Now even assuming those things happened, they in no

13   way come even close to the kind of sustained predatory

14   continued behavior that Ms. Larsen engaged in here, when all

15   she had to do was pull the plug.  And, in fact, I am sure the

16   Court reviewed them, but in the Skype chats it's pretty clear

17   that they had a conversation wherein Mr. Holt revealed that he

18   was a pedophile to Ms. Larsen, and she says:  Well, I -- you

19   know, essentially:  I still love you, I still want you.

20          THE COURT:  He said:  I like children, I don't like

21   women.

22          MS. SMITH:  Right.  Couldn't have been more clear.

23   And yet Ms. Larsen, to keep him as her long-distance boyfriend,

24   went on to sexually abuse Minor No. 1 at least three times days

25   afterwards, and then went on to abuse over the course of the

1    following nine months.  Not only that, but then also obtained

2    Minor No. 3 for her boyfriend and deceived her brother.

3              Then I mentioned something that's in the papers which

4    is really haunting:  Imagine being the father, knowing your

5    sister made your own child available to someone whom she knew

6    would abuse him, not once, but twice, at least, that we know

7    of, as reflected in the texts.  And during the abuse dad is

8    texting Ms. Larsen to check in on how his son is doing.

9    Ms. Larsen responds:  They're having a blast.

10             THE COURT:  Did I read some of these texts

11   correctly -- very difficult reading -- that she would sometimes

12   leave the home and leave this man with the children by

13   themselves?

14             MS. SMITH:  Yes, your Honor.  I want to point out in a

15   text that I think that nicely -- not nicely, but unfortunately

16   sums up the depravity of this relationship and Ms. Larsen's

17   willing participation in it; and it's in a text, a text

18   exchange that's in Government's Exhibit F, at page 4, in

19   document 75 -- or 74-5.

20             So there's a couple of texts that are going back and

21   forth, and they are clearly having an argument about Ms. Larsen

22   not getting from Mr. Holt what she needs, mainly sex, that he's

23   not giving her the attention she wants, even though she's held

24   up to her side of the bargain, namely, getting him the

25   children.

1    And this sort of culminates.  And as the Court saw in

2    these chats, along the way at points Ms. Larsen even said --

3    and defense counsel said she's not a pedophile, which I don't

4    know if she is or isn't, your Honor.  I would submit that

5    engaging in repeated sex acts with one's own two-year-old son

6    is pretty clear evidence of pedophilia.

7    But regardless of the diagnosis, that doesn't matter,

8    the point is that she did it.  And at points during those

9    chats, and leading up to encouraging Mr. Holt to move out in

10   August - so the Skype chats were in May - she says:

11   My urges are coming up again.

12   Meaning about Minor No. 1 and having sex with him,

13   meaning:  I am into this with you.

14   So in April of 2015, and the search warrant was

15   executed the following month, they're having a back-and-forth

16   text exchange about this argument about her providing the

17   children and her not getting sex.

18   And finally he says:  Look, I don't blame you.  If you

19   want perfect, you don't want me.

20   She responds:  I don't want perfect.  I just want to

21   be wanted.  And, yes, I have done things as part of our

22   agreements.  I have gotten you - and she uses the name,

23   Minor No. 3 - as much as I can, and even left the house on

24   numerous occasions so you could have alone time with the kids.

25   I have tried all that I can do to make you happy.  I became

1    this way, when I feel I give and give and only ask for one

2    thing in return, and it's like I don't do enough to deserve

3    that one thing.  Yes, you are right.  I wanted someone to care

4    for the kids, and I couldn't be happier in the way I see you

5    with them; but when it comes to me, you always have one thing

6    or another that I am either doing wrong or didn't do what you

7    wanted and, again, you are mad at me.  I spend more nights than

8    you think crying myself to sleep because you want nothing to do

9    with me, paren, I mean anything, example, watching a movie or

10   going out, just us.  And, no, I do not purposefully not hear

11   your hints.

12          And my hints she's talking about him having sex with

13   the children.

14          Obviously you are not very clear in some of your

15   requests.  You know I want you.  I am just tired of feeling as

16   I have always felt in every relationship that I have had, that

17   I am good for being present, and that's it.  I feel like I

18   don't mean anything to you.

19          So regardless of whether she's a pedophile or not, the

20   point is that she put her desire to be wanted above the needs

21   of her -- not just the needs, I mean she provided these

22   children to being repeatedly sexually molested up to ten hours

23   a day by a man whom she knew was a pedophile and did it

24   herself.

25          And the argument that once he got here that somehow

1   magically she extracted herself isn't true.  She said in her

2   interview during post-arrest that she took the pictures and the

3   videos of Minors No. 1 and 3, wherein Minor No. 1 is now so

4   sexualized – this is outlined in the PSR – that he was himself

5   molesting his own cousin, because, of course, this is

6   completely normal now for a two-year-old in diapers.

7         And yet she minimized her own conduct by saying:

8   Well, I have seen the pictures, but I was looking away.  Which

9   is patently I think absurd, your Honor.

10         She's not a monster, she's a mom.  Moms are supposed

11   to take care of their kids, not sexually abuse them for the

12   deviant pleasure of somebody else and for themselves and for

13   the purpose of getting attention for themselves.

14         And the issue about minor No. 2, I will point out for

15   the Court and as reflected in the chats and in the texts,

16   Mr. Holt was repeatedly asking for access to Minor No. 2.  We

17   have chats wherein they are -- or texts where they are

18   discussing this, including in April, and it's not clear, and we

19   don't have -- you know, I can't prove a negative, your Honor, I

20   can't prove that it didn't happen, and I think it's a fair

21   inference that Mr. Holt probably did have sexual contact with

22   Minor No. 2.  I hope that's not the case.

23         But all three of those children are damaged.  They are

24   struggling.  Minor No. 3 is -- they are all still in

25   counseling.  He is expressing -- he's three and a half, he's

1  expressing incredible anger.  He still refuses to potty train.

2  He screams every time he's placed on the potty.  The parents of

3  Minor No. 3 reported that after those two visits that

4  Ms. Larsen encouraged and during which she said they were

5  having a blast.  They reported he had anal bruising and bloody

6  stools.  And imagine how they feel, that there is another mom

7  of Minor No. 3 who could not protect her son, who thought she

8  was doing the best she could, just like her husband, who

9  thought they were placing the life of their son in the best

10  hands, which was his sister, someone to whom he was close,

11  despite her protestations to the contrary, and allowed him to

12  be anally raped.

13        So the idea that she had a difficult childhood also is

14  belied by this family.  Even though Ms. Larsen says repeatedly

15  in the course of the PSIR investigation and during the course

16  of the psychologist's interview, the family members will tell a

17  different story, that she had financial support; that she had

18  emotional support; that she and her sister and her brother were

19  all close and they, quote, had each other's backs; that her

20  mother was surprised when she learned when Ms. Larsen said they

21  weren't close.  She thought they were.  And I think the Court

22  can infer from the letter what kind of relationship they had.

23        And certainly the allegations of physical abuse her

24  brother denies ever occurred; that her dad had a short temper

25  and would yell, and they would get spanked when they deserved

1    it, but that's about it.

2          Your Honor, I don't know about you, but that doesn't

3    sound anything like the real tragic childhood stories we hear

4    about.

5          I also want to talk about the sexual abuse as a child

6    issue, because I think it bears -- imagine being Minor No. 1

7    and Minor No. 3 and growing up and hearing:  If you get abused

8    as a child you are going to be a child molester.

9          The evidence isn't there.  There is study upon study

10   that say sex offending -- being a victim of a sex offense as a

11   child does not cause sexual abuse as an adult, but instead that

12   those allegations are made by those who are accused of sex

13   crimes against children to garner sympathy to explain the

14   behavior, to say I did this because it was done to me.

15         Yeah, when confronted with that evidence using

16   polygraphs or other corroboration, while the rate of disclosure

17   is very high for that population, once confronted the rate goes

18   down to about 3 percent in the population, which is true,

19   that's -- the general population, it's about 3 percent of

20   people who have been sexually abused as children.  So while the

21   population self-reports about 50 percent of the time they have

22   been abused, in reality it's only about 3 percent, which is the

23   same as everyone else.

24         Because imagine if you are Minor No. 1 and No. 3, and

25   now you are an adult, and you know you have been abused as a

1   child because of the pictures of it, imagine the fear of that,

2   going through life thinking I can't be around kids because I am

3   going to touch them.  I am not going to be able to help myself

4   because of what my mom did to me, what my aunt did to me, what

5   my aunt let her boyfriend do to me.

6          And also, if it were true, we would see far more

7   female sex offenders than we do, and thankfully it is rare,

8   although that's not the case today.

9          As to Dr. Schneider's report, your Honor, she's not

10  here to be subject to cross-examination.  I can't ask her about

11  the assessments she didn't do, I can't ask her about the

12  reports she didn't read, I can't ask her about the chats she

13  didn't look at, I can't ask her about the videos she didn't

14  watch.  She does say in her report that she reviewed a series

15  of things, one of which is the materials supplied to her in

16  discovery by Ms. Larsen -- or by Ms. Stimson, which she

17  reviewed for about a total of 30 minutes.

18         I don't know about your Honor, but it took me quite a

19  lot longer to go through the materials, and that's just the

20  limited bit I provided the Court.

21         Certainly Ms. Larsen's recitation of events simply

22  doesn't line up with what the facts show.

23         Much, though, of that report, and I can understand

24  why, it's an attempt to explain the inexplicable.  A sexual

25  attraction to children is one thing.  Having a mother who is,

1    you know, attracted to a man, and then learns he's a pedophile,

2    and then engages actively in sexual abuse of her children and

3    provides them in the future, it's an attempt to explain why.

4            And, your Honor, I don't know why, but something --

5    and I agree with Ms. Stimson on this point, something is

6    broken, and something is broken inside of her that is so

7    broken, and that she is a risk to the future of the society,

8    that if she's willing to do this to her children just because

9    she wants a boyfriend who will pay some attention to her, what

10   does that mean she's also capable of.  And if she's given a

11   sentence of 20 years, she will be 44 when she's released, and

12   she could have more children.

13           So a sentence of 90 years -- 20 years is a longtime.

14   It's not long enough, not by a long shot.  And I believe, your

15   Honor, that a sentence of 90 years is appropriate here.

16           And I provided the Court what I thought was an

17   interesting take on the Guidelines, because once you get above

18   360, there's really no measure, it's life, right.  So there's

19   no sort of where you go and the sentence isn't -- can't be

20   life, where it's a term of years.

21           And I provided the Court with an alternative

22   calculation, and the sentence that this offense level would

23   have been had there not been a cap of 43 years is above the 90

24   years that the government is asking for.  It's also well below

25   a sentence she could have gotten if convicted of all 12 counts,

1    which would have been in the order of over 300 years.  And with

2    good time, if she lives to 103, she'll be released.

3         But, your Honor, I submit that under the factors that

4    this Court must consider under 3553(a), the impact of what

5    she's done, the heinous nature of her crime, the impact on her

6    family that this has had, the impact on her children and her

7    nephew that this will have forever because of the images she

8    took and then distributed to Mr. Holt, who then was in turn

9    distributing child pornography to the world, is forever.  It is

10   a life sentence and beyond for them and for this family.

11        So I submit, your Honor, for those reasons and for all

12   the reasons I stated in my motion that a sentence of 90 years

13   is appropriate here.

14        THE COURT:  Let me ask you something, Ms. Smith.  You

15   stated something in your response that I thought was well taken

16   and I agree with, and that was you were responding to the fact

17   that Ms. Stimson in her motion was focusing on prior sentences

18   that I personally in this courtroom have handed down to

19   defendants convicted of this same crime, this same statutory

20   crime, and your point was that I shouldn't limit -- to the

21   extent sentences of other individuals is a sentencing factor

22   that I consider, that I shouldn't limit myself just to the

23   sentences that I have imposed previously.  And I agree with

24   that.  I haven't been on the bench long enough to have,

25   thankfully, with these cases, a broad enough range of cases

 1    that I can have a statistically significant sampling, if you

 2    will.

 3              You have been prosecuting these cases much longer than

 4    I have been sentencing them.  Give me your sense and your

 5    perspective as to where this case fits in in the spectrum of

 6    the production cases that you have sentenced in terms of the

 7    egregiousness and, therefore, give me a sense of how this

 8    compares to other prosecutions that you've had.

 9              MS. SMITH:  Your Honor, I will premise my statement

10    with something similar to yours, which is it's true, I have

11    been prosecuting these cases for, I don't know, six and a half,

12    seven years.  My perspective is very limited as well.  When I

13    first started this job we had very few production cases, and

14    over the course of seven years our rates of production cases

15    have gone up on the order of 600 percent.  And some of that is

16    due to changes in the state sentencing schemes wherein most of

17    these cases were an indeterminate sentencing when they resulted

18    in prison sentences.  That's not the case anymore.  Many sex

19    offenders in Colorado are now being released.

20              And we've had, you know, on the order of 15 cases, or

21    so, I am ballpark -- I am spitballing, and I submit to your

22    Honor that that is such a limited universe of cases that I

23    cannot really submit to the Court what -- how this fits in

24    nationwide.  Because that's the directive, it's not -- as your

25    Honor well knows, it's not similarly situated defendants in

1    this courtroom, or even in this district, it's nationwide.  And

2    that is why -- and while the Guidelines are much maligned -- I

3    will point out the commission just issued suggested changes to

4    2G1. -- 2G2.2, which is the distribution Guideline, and they

5    didn't lower the offense levels, they didn't lower the base

6    offense level, they didn't lower any of the adjustments.  They

7    made some comments about when certain adjustments would apply.

8    And that was a prime opportunity for the commission to change

9    the Guidelines, for Congress to change the Guidelines, and none

10   of that -- that didn't happen.

11         So I submit to the Court that the Guidelines are a

12   reflection of what Congress and what the sentences are

13   nationally, which is why I did that additional calculation to

14   provide the Court some guidance.

15         In terms of this district -- so that's what I put out

16   there.  And if the Court goes online and does -- you will see

17   cases where sentences are hundreds of years long.  You will

18   also see sentences that are 20 years long, as the Court is well

19   aware.

20         In this district, however, and I cited this in the

21   papers, is **U.S. vs. Wolf**, and that was a case involving sexual

22   abuse by a family member of a family member, but not a parent,

23   and it happened approximately 14 times over the course of seven

24   years.  Very deliberate, aggravated.  No distribution in that

25   case.  And I asked also in that case for 90 years and received

1   a sentence of 60 years.  But I submit to your Honor that this

2   case is at least on that level, but I believe that it is worse.

3           This was a concentrated period of time.  The

4   defendant, within days of learning that her new boyfriend liked

5   to have sex with children, engaged in sex with her children --

6   child, took pictures of her daughter, sent them to him.  And we

7   have eight of those videos only because Mr. Holt filmed them

8   while they were occurring.  And if your Honor looks through the

9   Skype chats, there's a whole lot more sessions, and we will

10  never know what occurred during those sessions, because they

11  are not recorded.

12          And it involves the obtaining of another two-year-old

13  kid and the filming of the abuse of that child, not once, but

14  at least twice.

15          So I think it fits squarely within the heartland of

16  the Guideline of life, and I think a sentence of the statutory

17  maximum of 90 years, it's below that -- if it were all

18  calculated out to her base offense level -- her adjusted

19  offense level, it's an appropriate sentence.

20          THE COURT:  All right.  Thank you, Ms. Smith.

21          Ms. Stimson, it's your motion, I will give you an

22  opportunity for a very brief reply.

23          MS. STIMSON:  I would like to focus my reply, your

24  Honor, on some comments I made before, and that goes also to

25  this **U.S. vs. Wolf** case.  Ms. Larsen allowed Mr. Holt to

1    sexually abuse her kids, and Ms. Larsen sexually abused her own

2    son a very small number of times, and he was a very young

3    child.  Different from someone sexually abusing, raping a

4    teenage girl and videotaping that over seven years.  And that

5    person received 60 years.

6         Different from all the other cases across the country

7    is her role in providing the kids and not being the primary

8    abuser.  And I think that that is still very bad, but

9    distinguishes her from these kind of life sentence, 60-year,

10   90-year-high cases, is her role difference.

11        I have nothing further.

12        THE COURT:  All right.  Thank you.

13        Before I rule on the motion I am going to consider

14   some of the Section 3553(a) sentencing factors in light of the

15   specific facts of this case.

16        With regard to the history and characteristics of this

17   defendant, Ms. Larsen is 27 years old.  She is a citizen of the

18   United States.  She was born in the Denver area and has lived

19   here her entire life.  Her parents live in the Denver area as

20   well as do her brother and sister.

21        The defendant claims that she was subjected to sexual

22   touching and abuse as a teen-ager by an uncle and non-family

23   members, but as the government and the probation officer have

24   pointed out, there is no contemporary record of these events,

25   and even members of her own family have some doubt as to the

1   veracity of these accusations, which apparently were given

2   voice only after Ms. Larsen's arrest for the instant offense.

3         In 2005 the defendant completed the 11th grade at

4   Standley High School in Westminster, Colorado.  While she

5   attended the 12th grade, she did not graduate from that school.

6   Ms. Larsen has attended GED classes during her period of

7   pretrial detention, and according to defense counsel she

8   recently received her GED.

9         The defendant was in a relationship with a John

10   Faurbo, F-A-U-R-B-O, age 27, from December 2005, through June

11   of 2008.  Mr. Faurbo currently lives in Oklahoma.  The couple

12   had one child together, AL, who is victim No. 2 in this case.

13   According to the probation officer, Mr. Faurbo left the

14   defendant when AL was about one year old.

15         The defendant married Eric Schulz, age 28, in

16   Broomfield, Colorado, on the 1st of November of 2009.  They

17   were separated from December of 2012 until they officially

18   divorced in May of 2014.  He is employed in the security field.

19   They have one child together, ZL, who is Minor Victim No. 1 in

20   this case.

21         The defendant claims that she left Mr. Schulz because

22   he allegedly became physically abusive to their son.  The

23   probation officer contacted the Department of Social Services,

24   which reported that they had determined that Ms. Larsen's claim

25   of physical abuse was unfounded, and as a result no charges

1    were ever brought against the defendant's ex-husband.

2         From the early part of 2012 until the time of her

3    arrest the defendant was living in the basement of her father's

4    home located on West 111th Avenue in Westminster.  She met her

5    codefendant, Matthew Holt, on the Plenty of Fish online dating

6    site in March of 2014.  At that time Mr. Holt worked as an

7    over-the-road trucker and lived in Florida.  Mr. Holt visited

8    the defendant a couple of times before he moved in with the

9    defendant and her children in August of 2014.

10        At the request of defense counsel, a psychological

11   assessment was completed in December of 2015 by Dr. Nicole

12   Schneider, who made the following mental status and behavioral

13   observations, that:

14        Ms. Larsen's thought processes were clear, organized,

15   linear and logical, and that she was fairly insightful into her

16   feelings and history.  The defendant reported no thoughts or

17   plans to harm herself, at least to the Doctor.  Dr. Schneider

18   noted the defendant's intelligence is estimated to be in the

19   average range.

20        Dr. Schneider's impressions and recommendations were

21   as follows:

22        The defendant has had a traumatic childhood, was

23   bullied in school, and as a result developed a persona in which

24   she does not admit that she is struggling, but her

25   relationships are fraught with insecurity, exploitation of her

1    and the loss of self-identity.

2              Dr. Schneider believes that when the defendant met

3    Mr. Holt he told her positive things about herself and made her

4    feel loved and, quote, "Fed her all the emotional food she was

5    so desperate for," end quote.

6              Ms. Larsen was so desperate to be loved, according to

7    Dr. Schneider, that she became convinced that it would be the

8    best thing for her children to have a father figure who loved

9    being with them, even if it meant that he could satisfy his

10   sexual desires with them, end quote.

11             She claims she was told by Mr. Holt that her children

12   would not remember what he was doing and that they might even

13   enjoy it.

14             The acts she participated in she did not believe were

15   harmful to her children at the time.  It is Dr. Schneider's

16   opinion that the defendant never set out to harm her children.

17   According to this psychologist, the clinical formulation of

18   Ms. Larsen is one of depression and personality disorder.

19             This report by Dr. Schneider was not particularly

20   helpful to me.  I agree with the government that this report

21   was a psychological assessment which contained no assessments.

22   In preparing the report, the psychologist relied in great part

23   on the defendant's self-serving, sometimes false and

24   demonstrably incomplete version of events.

25             There were no personality tests done, no risk

1   assessments conducted, no analyses of any DSM factors.  No

2   family members, other than the defendant's ex-boyfriend, were

3   interviewed to corroborate the defendant's versions of her

4   childhood and claims of abuse.

5        It is also not clear, and at least so far in this

6   hearing it has been contested, whether or not Dr. Schneider

7   also reviewed the Skype chats and text messages between

8   Mr. Holt and Ms. Larsen, which had she didn't so in my view

9   would have caused her to at least doubt, in some part, the

10   accuracy and completeness of much of what her patient was

11   telling her.

12        With regard to gainful employment, since 2006 and

13   until the time of her instant arrest the defendant has worked

14   for varies employers as a phone operator, receptionist, cashier

15   and courtesy clerk.

16        With regard to Ms. Larsen's criminal history,

17   according to the PSIR she has no juvenile adjudications, she

18   has been assessed zero criminal history points, and she is

19   before me on her first felony conviction.

20        Turning to the nature and circumstances of the

21   offense, the factual details of the offense conduct in this

22   case are set forth in the Presentence Investigation Report in

23   great detail.  Because of their horrific nature, I cannot and I

24   will not recite those details on the record at this hearing.

25   Given that the parties and counsel have all had access to the

1    report, and it is part of the record, there is no need for me

2    to repeat any of that information in open court at this time.

3         So that the record accurately reflects my own

4    familiarity with the facts of this case, however, I will

5    provide a very brief summary of the nature and circumstances of

6    the offense charged in this case.

7         The instant offense involves the defendant producing

8    child pornography using her two children, ages 2 and 8, as well

9    as her nephew, also age 2.  The defendant made videos of

10   herself engaging in sexually explicit conduct with her

11   two-year-old son, mostly using Skype messaging with her

12   codefendant, Matthew Holt.  She took pornographic pictures of

13   her eight-year-old daughter and sent these photos to the

14   codefendant via her cellular telephone while he was living and

15   working in Florida.

16        The defendant participated in the video production of

17   her boyfriend sexually molesting her two-year-old son.  And on

18   two occasions she convinced her brother and his family to allow

19   their two-year-old son to come over to their home, ostensibly

20   for sleepovers with his cousins, but in actuality to offer him

21   up for sexual abuse and molestation by her codefendant, conduct

22   which she then personally filmed.

23        On May 12th, 2015, Denver Federal Bureau of

24   Investigation was contacted by Westminster Police Department

25   for assistance with a child exploitation investigation.

1           Special Agent Fourkas and Special Agent Vanicelli met

2     with Det. Brian Adams of the Westminster Police Department on

3     that day.  They were informed that the Larimer County Sheriff's

4     Office had downloaded child pornography using peer-to-peer

5     software on the 7th of April 2015 from a residence in

6     Westminster, Colorado.  One of those images they downloaded was

7     entitled, quote, baby hotest mom, this is the ultimate preteen

8     perversion.jpg.  The image is of an adult female performing

9     oral sex on a very young prepubescent child.

10          Computers, electronic media and cellular telephones

11    were seized during the search.  None of the seized devices and

12    none of the cellphones used by either Mr. Holt or Ms. Larsen at

13    any time were manufactured in Colorado.

14          Shortly after the search Westminster Police Department

15    previewed the contents of Mr. Holt's laptop and discovered

16    thousands of images and videos of child pornography.

17          In addition, the Westminster Police Department

18    discovered images on Mr. Holt's cellphone revealing that he and

19    Ms. Larsen had used Minor No. 1 to produce child pornographic

20    images and videos at the Westminster residence.

21          It was later determined that Mr. Holt had used

22    Minor No. 3 to produce child pornographic images, and that the

23    defendant had used Minor No. 2 to produce child pornographic

24    images.

25          Approximately 800 images of minor victims were

1    recovered from a Seagate external hard drive.  About 400 of

2    these images were child pornography images of these three

3    minors.  There were, in addition, 563 produced images found on

4    an Acer computer, as well as 150 produced images found on

5    codefendant Holt's phone.

6        The defendant admits that the criminal offense of

7    which she has been convicted involved a minor who had not

8    attained the age of 12 years; that the offense involved the

9    commission of a sexual act and sexual contact; and that the

10    offense involved a minor who was in the custody, care or

11    supervisory control of the defendant; that the offense involved

12    distribution; and that the offense involved material that

13    portrayed sadistic or masochistic conduct.  The defendant

14    admits that the offense involved the use of a computer to

15    solicit participation of a minor.

16        As of today the defendant has served 337 days, or just

17    over 11 months, in pretrial detention.

18        Ms. Paul, do you wish to make any statement at this

19    time on behalf of the Probation Office?

20        THE PROBATION OFFICER:  Your Honor, I have about three

21    or four pages worth of things that I wanted to say, and then I

22    read the government's response and realized I should have read

23    that first before I started writing things, most of the same

24    things are there.

25        I just wanted to point out a couple of things and -- a

1    few things that you brought up.  You said knowing the things

2    that she knows, how could she have left her children alone with

3    this man.  And in the interview with the F.B.I. there's just a

4    few comments I wanted to point out in relation to that.

5           They asked her, you know, knowing what you -- you

6    know:  What did you think would happen when you left him alone

7    with your children?

8           And her response was, quote, "I could only imagine

9    what was happening."

10          So, obviously, she knew what was going on.  And then

11   she also said she didn't know what to do.  You know, she was

12   going to work every day.  She had so many opportunities to call

13   the police, go to her family.  We all know that now after

14   discussing everything today.

15          And then there was another quote that stood out to me.

16   When she was asked -- when she was being talked to about the

17   whole situation and she comment -- I am sorry, I am looking for

18   the direct quote.

19          THE COURT:  That's all right, take your time.

20          THE PROBATION OFFICER:  She said -- I think I can

21   remember it directly.  I -- I just had it in front of me:  I

22   thought if you touched the kids a few times, they are young,

23   whatever.

24          Like they wouldn't remember.  And you've mentioned

25   this earlier on in this sentencing, that we don't know what the

1    kids are going to remember.  We don't know what the Minor

2    Victim No. 2, a two-year-old -- or 1, a little boy, is going to

3    remember when he is older.  While he may not remember the

4    actual abuse himself, she's going to be in prison, and he's

5    going to be asking where is mom, and so at some point in his

6    life he's going to have to be told what happened.  And so like

7    I said, he might not remember exactly what happened, but it's

8    going to be on his mind.

9         And then --

10        THE COURT:  And the daughter at eight is old enough to

11   remember.

12        THE PROBATION OFFICER:  She's old enough to remember.

13   I think the government had pointed out how -- because of this

14   event they are so bonded, and they are both so afraid to be

15   away from each other they -- you know, the two-year-old needs

16   to see the eight-year-old before she goes to school, and if he

17   doesn't see her, then he's really upset and asking about her,

18   when is she going to come home.  So they are completely

19   traumatized, which is expected, and we all know that.

20        It's brought up a couple of times that Ms. Larsen is

21   not the primary perpetrator.  You know, Mr. Holt, what he did

22   was worse.  I have seen the videos and read the chats, and, you

23   know, she's smiling and laughing and giggling during these

24   videos, so it's not -- she was a willing participant.  And as I

25   mentioned in my sentencing justification, I am certain Mr. Holt

1    would have done this to somebody else.  But for Ms. Larsen's

2    actions, these children would not have been victims at all.  We

3    wouldn't be here.

4            So I stand by my recommendation of 90 years.  And as I

5    mentioned in the report, I don't think she deserves to see the

6    light of day outside of a prison cell.

7            THE COURT:  All right.  Thank you, Ms. Paul.

8            Ms. Smith, maybe at this time it would be a good time

9    for you to ask if any family members wish to address the Court.

10           MS. SMITH:  Thank you, your Honor.

11           THE COURT:  Actually, why don't we take a brief

12   recess.  We'll be in recess for ten minutes.

13       (Recess at 3:29 p.m.)

14       (Reconvened at 3:41 p.m.)

15       THE COURT:  Ms. Smith, are there any family members

16   that wish to address the Court?

17           MS. SMITH:  Yes, your Honor, there are three.

18           THE COURT:  All right.  As I said before, we will

19   limit them to five minutes each.  They don't have to take the

20   five minutes, but that will be the limit.  Who do you wish to

21   speak first?

22           MS. SMITH:  Your Honor, I think the mother of

23   Minor No. 3.

24           THE COURT:  All right.

25           MS. SMITH:  Your Honor, I misunderstood.  I am to read

1    her statement into the record, if it would please the Court.

2              THE COURT:  Sure.  Go ahead.  This is the written

3    statement submitted by the mother of Minor No. 3?

4              MS. SMITH:  That's correct, your Honor.

5              THE COURT:  All right.  Go ahead.

6              MS. SMITH:  "As a mother myself I can never understand

7    how you could live life knowing that your children can never

8    lead a, quote, normal life again.  They will never truly know

9    their own mother, especially Minor No. 1.  The people that will

10   be raising them now will die soon -- too soon, so they may

11   never get to see Minor No. 1 and Minor No. 2 graduate high

12   school or go to college, or have a first love, get married,

13   have kids.  They will never get to see them grow old and

14   neither will you.  Their lives have been totally turned upside

15   down and the only one to blame is you.  They will never forget

16   that.  They will always remember that their mother, the one

17   person that is supposed to be hard-wired to love and protect

18   their kids, failed them, let them down, betrayed them and hurt

19   them herself.  You betrayed us all and lied to all of your

20   family and friends.  You hurt all of the people that loved and

21   cared about you the most.  I feel that what you did to

22   Minor No. 3 was a personal attack on me.  You're mad at me and

23   got back at me the only way you could.  You took it out on my

24   baby, your nephew, your brother's child.  I honestly feel --

25   excuse me.  I honestly feel that have never cared much for me

1    and didn't want to have more since apparently we can no longer

2    trust our own family."

3          I skipped a line.

4          "I honestly feel that never have cared much for me and

5    didn't want to have anything to do with Minor No. 3, until it

6    benefited you and your needs.  No one truly notes who to trust

7    anymore, since apparently we can no longer trust our own

8    family.  They are the people that are supposed to help, love,

9    support and protect one another, and I think that is what hurts

10   us the most.  Basically I don't know how to put into words or

11   express my feelings of utter resentment and hatred I have for

12   you with the unspeakable things you have done to your children

13   and mine."

14         THE COURT:  Thank you.

15         All right.  Who will speak next?

16         MS. SMITH:  Your Honor, I believe Ms. Larsen's sister

17   would like to speak.

18         THE COURT:  All right.  Ma'am, please come forward.

19   Can you pull the microphone down to you.  Please state your

20   name for the record and tell me how you are related to the

21   defendant.

22         MS. DEVIN LARSEN:  My name a is Devin Larsen,

23   D-E-V-I-N, Larsen, L-A-R-S-E-N.  I am the sister --

24         THE COURT:  Just grab the mike and pull it to your

25   mouth so I can hear you better.  Go ahead.

1          MS. DEVIN LARSEN:  All right.  Jordain, everyone says

2     the past is to be learned from and to be forgotten, but what

3     you have done resides in the back of our minds every day.  When

4     your name -- when your name comes to mind I feel very angry,

5     but most of all I feel betrayed.  You betrayed the trust and

6     love of three innocent children, you betrayed the family that

7     took better care of your children than you ever did, and you

8     betrayed me.  I looked up to you what feels like a very long

9     time ago.  Were you just so unhappy with yourself that you had

10    to bring the children into this?  This has to -- this has to be

11    a horror movie you see on the TV, or nightmare, it just can't

12    be real.  You gave up the strongest love a person could give

13    another.  The love of a child is more than a man could ever

14    give you.  The bond is such a beautiful and cherished feeling,

15    and you gave it all up.

16          THE COURT:  Miss, can I stop you one second?

17          MS. DEVIN LARSEN:  Yeah.

18          THE COURT:  I know you are nervous.  I know it's not

19    easy to speak in a federal courtroom.  Just take a deep breath

20    and try to read a little slower, both for my court reporter and

21    just so I can understand you better.  You are speaking very

22    quickly, and I am missing some of what you are saying.

23          MS. DEVIN LARSEN:  All right.

24          THE COURT:  So just take a deep breath and speak a

25    little more slowly.

1              MS. DEVIN LARSEN:  Every thought that comes to mind

2       about you is filled with anger and every moment is filled with

3       tears.  The pain you have caused is forever engraved in our

4       hearts and minds, it can never be forgotten.  The stress you

5       have put on all our lives is unfathomable -- is not fathomable.

6       I don't understand how you could even think it was okay to

7       write us and then say you are sorry.  This is something that

8       can never be taken away and I will -- and it will never in this

9       world be forgotten.  Are you sorry for the fact that you ruined

10      so many lives or that you were caught?  The thought of you and

11      what you have done disgusts me, but I will remember it every

12      day.  When your birthday passes, it's nothing but a painful

13      memory, a broken heart -- a painful memory -- sorry.  It is

14      nothing but a broken heart felt by many.  Many of us cried that

15      day.  What happened to you?  What happened to my sister?  It's

16      like I never even had one.  I want to pretend that you never

17      existed, but without you we would not have those beautiful

18      children in our lives.  I cry at how much love they give.  I am

19      so thankful to be part of their lives.  Because of us they will

20      know love, faith and what a safe home is.  You taught me nobody

21      can be trusted, sometimes not even family.  The ones who we

22      love the most often hurt us the most.  You were trusted to take

23      care of the two blessings in your life.  We all believed you

24      when you said the children were safe.  We trusted you to be the

25      mother you needed to be.  They trusted you.  You gave up

1    countless holidays, birthdays, sick days, thousands of

2    memories.  How could you sacrifice everything?  I am sure you

3    will always have some love for your mother, no matter what they

4    do.  Why is it such -- why is it in such terrible times, when

5    you have nobody, that you try reaching out to mom or even any

6    of us?  You were so caught up in yourself you forgot who was

7    there for you when no one else was.  Who rescued you when you

8    needed help?  Family.  No matter the issues from the past, who

9    was always a phone call away?  Who saved your life?  Family.

10   Though we weren't always close, when your world is falling

11   apart and you had no one to turn to, we were all there.  You

12   seemed to be searching for something you could never find.

13   That's because you constantly looked in the wrong place.

14   Family and the love of your children was all you needed.  You

15   could have asked for help at any moment.  There is no excuse,

16   no reason for what you have done.  How could you bring

17   Minor No. 3 into the matter?  It just shows how disgusting you

18   are.  You pretend like you were the one in danger, but then to

19   find out that was all because of you.  This just couldn't be

20   true.  You looked me and my family in the eyes and lied.  How

21   could you harbor such secrets?  You proved what a dark and

22   terrible world we live in.  If I choose to have children one

23   day, they will always be protected and always be shown love.

24   You dug your grave, time to bury yourself in it.  I guess it's

25   easier to say that the old, you died away, and the monster

1    inside you changed you one dark day, but had that monster

2    always been there in the shadows lurking away?  What grinded

3    the gears in your mind that made you go astray?  I hate you.  I

4    will never forget you, but you are a monster in disguise.  The

5    day I found out truly who you were to me, that day you died.

6    This is something you had to know, that there was no second

7    chances.  You gave up everything.  You don't deserve the love

8    of a child.  You disgust me.  I never want to receive a letter

9    from you again, no drawing, no birthday card.  I want nothing

10   to do with you.  I am done.

11              THE COURT:  Thank you, ma'am.

12              MS. SMITH:  Your Honor, finally, Ms. Larsen's mother.

13              THE COURT:  Okay.  Ma'am, if you could pull the mike

14   towards you, towards your mouth.  Please state your name for

15   the record and tell me how you are related to the defendant.

16              MS. ROLLERSON:  My name is Melanie Rollerson.  I am

17   her mother.

18              THE COURT:  Go ahead, please.

19              MS. ROLLERSON:  I wondered what I would say to you

20   when I saw you.  I wrote seven, eight letters trying so very

21   hard to understand.  I came prepared to apologize to you for

22   being so weak, for not changing my circumstances before I did.

23   But I also remember being so scared that our home was changing

24   because of the divorce, and the only reason we were getting a

25   divorce was because the only part of our lives that your father

1    didn't like anymore was me.  And I was so scared for you and

2    your brother and your sister on what that would do to you.

3         I dreamed of a very long, happy life.  And we've

4    always been there for you, for the kids.  And if you look over

5    there, look who's there, the same ones that were always there

6    when you needed something.  Papa is not here because he had to

7    stand up to the plate and take the place and do the things that

8    you should be doing today, taking care of Minor 1 and 2,

9    picking them up from school, taking them to things.  He

10   realizes he may never see you again.  That's a possibility

11   that's greater than less.

12        And as I told you in my letter, I don't understand.  I

13   thought I had taught you having a man in your life to share

14   your life with -- man, I guess, or whatever, is awesome, but

15   your legacy, the essence of who you are, the most unconditional

16   love you can ever have in this entire world is that of a child.

17   Your children love you, want you and need you no matter what,

18   whether you have a million dollars or you live in a shack.

19   They remember the smallest things.  They ask for the smallest

20   things.  It is so hard every day.  They think we're hiding you

21   from them.  And, no, I have to tell them they are in a safe

22   place, and that safe place does not include you.  You are not

23   safe for them.  And they still ask.

24        And I -- I just don't understand how you could have

25   done this to your own children.  You knew what Matt was before

1    he got here.  You knew what he wanted.  How could you?  How

2    dare you.

3            Who was always there when your car wouldn't start or

4    when someone degraded you or you needed the strength of a male?

5    Your brother.  Who did you damage?  His son.  How could you do

6    that?  You say that they probably won't remember.  Well, I am

7    here to tell you that they will.  And they may not remember

8    exactly why, but you forever have changed the course of their

9    lives and their relationships.  It could be as simple as a

10   smell, as simple as a color, as simple as a moment.  They will

11   be forever changed and relationships.

12           And how you could forfeit your daily life, as simple,

13   as mundane as being a mother can be?  Your children sometimes

14   can be -- seem so ungrateful, and you think that you deserve

15   better, but their unconditional love should be enough.

16   Sometimes you don't learn that until you are older and you

17   don't learn that until you have grandbabies.

18           And like I said, when I have them they still remember

19   the smallest of things.  They want the smallest of things.  But

20   I am happy to say they are always with papa in a home that is

21   stable, safe, where they will learn that they can do things,

22   they can do things wrong, there are consequences for your

23   actions, they will know honesty, they will know faith, and most

24   of all, they will know safety.  And until their dying breath

25   grandma and grandpa will not let anything happen to them.

1   Grandpa will not even let Addy walk to school for fear that

2   John may be there.  That hangs over our head every day, that

3   he's going to take her away, because he didn't win.  He didn't

4   get her.  He thinks she's property.  He's no better than you.

5   He didn't care how she felt, who she would be missing, what she

6   would be missing.  She knows in her heart who her family is and

7   who loves her, but none of that matters.  It's a constant,

8   every day struggle.

9        And you don't want a life sentence.  I don't care if

10  they give you 30 years, 60 years.  You gave the kids a life

11  sentence.  You gave us a life sentence.  There will be no

12  more -- I am tired of looking around the table and missing the

13  selfish souls that should be sitting at that table.

14       And how you could say you were never loved is beyond

15  my comprehension.  I didn't come here to defend myself, but I

16  guess I didn't do something right.  And maybe I will never know

17  what.  But I never lied to you, and that I can say, I never

18  lied to anybody.  I have always been honest about my feelings.

19  I made mistakes, and I gave you a chance.  And your kids were

20  loved beyond love.  They didn't lack for anything.  Even when

21  their fathers couldn't stand forward or stand up and help you,

22  who did?  Maybe I didn't tell you I was proud of you enough.

23  You were way stronger than I ever was.

24       THE COURT:  Ma'am, I am going to need you to finish up

25  pretty soon.

1          MS. ROLLERSON:  And you are my daughter.  You will

2     always be my daughter.  And unlike some people, I do not

3     believe that love dies.  I will always love you.

4          THE COURT:  Thank you, ma'am.

5          Ms. Stimson, will you and Ms. Larsen, please approach

6     the lectern.

7          Ms. Larsen, do you wish to make any statement to the

8     Court on your own behalf before I announce your sentence?

9          THE DEFENDANT:  Yes, sir.

10          THE COURT:  Go ahead, please.

11          THE DEFENDANT:  Your Honor, I have questioned myself

12     for much, as to how I can put into words how sorry I am and

13     remorseful I am for this entire case.  To me saying I am sorry

14     doesn't feel heartfelt enough, but I am sorry for all of this.

15     No words are powerful enough to describe the pain I feel for

16     the outcome of my actions.  Not only did I upset my children's

17     lives, I feel -- my entire family around them.  This pain is

18     caused by nothing but physical and emotional suffering the

19     children went through, and will endure for years to come.  And

20     it is my fault, and it is almost sometimes unbearable to

21     accept.  In the end, I have taken, their mother, and hurt them

22     deeper than any child should have to experience.  And they

23     write in the PSIR, repeatedly say that other children will not

24     have -- I will have to continue therapy in the near future, but

25     will also enable me to be released.  I am at fault for taking

1    their innocence and the damage I caused will last forever.  I

2    deal with misery every day knowing the pain I put my family and

3    children through.  Because in the end my parents will spend

4    their entire lives raising my children instead of being able to

5    rest and travel.  I spend every day wishing I could take

6    everything back, like their pain, and not the life they

7    deserved.

8         I wish I could go back in time and make better

9    decisions and had never met my codefendant.  To have my life

10   end and where my children are taken and placed with family is

11   the worst pain I have ever felt.  And to remove their mother

12   has to be beyond painful for them.  My children will have to go

13   through the emotions, every school project or parent-teacher

14   conference, because their mother will not be there.  They will

15   not have a mother to spend time with.  I have these days of my

16   life -- my kids -- the smiles on their faces creates the

17   deepest love I have ever felt.  My children and I went on

18   adventures to parks and to the mountains all the time.  We

19   would go to our favorite restaurant.  And would run into the

20   river and watch the ducks start after them.  My children and I

21   would just love -- my daughter was born with a wonder gift of

22   being able to sing.  Her whole life she has been singing.  She

23   started with her brother.  He would attempt to sing after her.

24   Both love me and are heartfelt.  Many years, we would all

25   dance.  Both children were dancing from their car seats to the

middle of the floor, even if that dance floor was in the middle
of the grocery isle.  Spending time with them, they fell in
love with arts and crafts, and tried to make something new.  It
turned into a love of cooking and experimenting with treats and
sometimes questionable ones.  If they became sick, they only
wanted me around, there was a day of chicken noodle soup and
movies.  To look back at these wonderful memories, I am filled
with deep sadness, because I will not be with them -- be there
for them ever again.

I wish I could explain to you why and how this
happened and how I could ever do such things.  These questions
I ponder every day.  And I wish I knew the answers myself.  I
spend my day working and trying to understand through therapy
and classes available at the jail and Bible study.  I have
attended classes, but they never change, life is -- there are
classes weekly.  I am learning about the choices I started
making at a young age and how to make better choices later in
life.

I can work on characteristics I wish to achieve as I
continue to learn how to handle and work through my severe
depression.  The relationships I have been through, I felt like
I was an outcast.  I struggle with how I felt.  I was the one
who could not be loved by anyone, but I became the person I
never wanted to be.

I realize I gave up my rights as their mother to be

1    with them every day, and this pain is deeper than ever can be

2    explained.  My children will grow up not knowing who I am.  And

3    I know, and I imagine, my son will never know me, and my

4    daughter's memories will soon fade away.  To hurt them so

5    emotionally is my fault, and I am sorry.

6         The severity of this case is intense, and I accept the

7    punishment.  And to me I only hope I am not the dreadful person

8    everyone thinks that I am.  I did something really terrible,

9    and it will be my deepest regret for my entire life.  I do

10   understand and try to continue my education, to be able to

11   fully understand myself and how to be a productive member in

12   society.

13        I will never do anything like this again, and I ask

14   you if you give me a second chance, and show some mercy.  And I

15   tell you from the bottom of my heart that I am really sorry for

16   all the pain I caused my children, my nephew and my entire

17   family, and I wish I could take it away.

18        Thank you for your time and consideration in my case.

19        THE COURT:  You tell me that you wondered if you could

20   ever be loved.  You were loved by your children.  That's what

21   everyone that touched this case has been trying to understand

22   and comprehend, how someone who had the love of a child -- and

23   the thing about -- I agree with what your mother said, she said

24   some very wise things.  One thing I have learned in my life is

25   in adult relationships, adults can manipulate with each other,

1   you can get into a relationship for money, you can pretend to

2   be in love with someone, but the love of a child, like the love

3   of a dog, is unconditional, it's there or it's not there.  You

4   had that love of your children.  Children don't fake love, they

5   either love you or they don't.  For you to have done this to

6   them, that's -- to this moment I cannot understand.

7          Mr. Holt was in Florida when you started this online

8   relationship with him.  Why didn't you just turn off your damn

9   computer and stop these Skype conversations with him?

10         THE DEFENDANT:  I can't give you an answer that you

11  would understand.

12         THE COURT:  At what time did you -- at what point in

13  time did you understand that he was a sexual predator of

14  children?

15         THE DEFENDANT:  Not too long after I met him.

16         THE COURT:  So before he moved in with you?

17         THE DEFENDANT:  Yes, sir.

18         THE COURT:  The moment you knew he was a child

19  predator, why didn't you go to law enforcement, why didn't you

20  go to your members of your family, your father, your brother,

21  why didn't you go to any of them any say, My, God, I made a

22  huge mistake, I met this guy online, I thought I liked him, but

23  he's a sexual predator, and I think he's interested in my

24  children -- in our children?  Why didn't you do that?

25         THE DEFENDANT:  I don't know, your Honor.

1          THE COURT:  You tell me now that you love your

2     children so much.  I believe you.  But how does -- how does a

3     mother perform oral sex on her two-year-old son, who is in

4     diapers, and film it?  Help me understand that, please.

5          THE DEFENDANT:  Again, your Honor, it's an answer that

6     you wouldn't understand, because there's no proof as to my

7     side.

8          THE COURT:  There's no what?

9          THE DEFENDANT:  Proof on my side.  But what I can tell

10    you is that it's the worst mistake I ever made.

11         THE COURT:  You knew that he was a sexual predator

12    soon after you met, and this Plenty of Fish online site in

13    March of 2014, but he didn't move in with you until August of

14    2014; isn't that right?

15         THE DEFENDANT:  Yes, sir.

16         THE COURT:  You learned soon after March through your

17    communications with him that he was a child predator.  How does

18    a mother let someone like that, not just let, but beg and lure

19    someone to come across the nation and move into her home to

20    live with her children when she knows he's a child predator?

21         THE DEFENDANT:  I don't have an answer.

22         THE COURT:  And then you lied to your brother and

23    sister-in-law and put their two-year-old son in harm's way.

24         You are asking me to have mercy on you, but you are

25    not answering my questions, you are not helping me understand

1    why it is that you did these things.

2             THE DEFENDANT:  I don't want to put the blame on

3    anyone else.

4             THE COURT:  Well, in your interviews with the F.B.I.

5    it sure sounded like you were trying to put all the blame on

6    Mr. Holt.  I mean he's a monstrous criminal in his own right,

7    he'll get what's coming to him, but you have to take

8    responsibility for your actions in here too.

9             THE DEFENDANT:  Yes, sir.

10            THE COURT:  So again I am telling you, you are asking

11   me to have mercy on you, but you are not giving me any

12   understanding or explanation of why it is you did what you did.

13            THE DEFENDANT:  The only explanation I can tell you

14   that you might understand briefly is during classes we have

15   learned different types of relationships and how you end up

16   growing up into certain ones.  I grew up in the role as

17   becoming what they call an abusee, and it ends up having the

18   same characteristics as abuser, and soon you don't even realize

19   who you are anymore.  And I know that sounds vague, and that's

20   why I didn't put it in my letter, but that is the honest to God

21   truth that I can only think of.  That's not making up excuses,

22   and everyone thinks I am.

23            THE COURT:  Anything else you wish to say to me?

24            THE DEFENDANT:  No, sir.

25            THE COURT:  All right.  I am prepared to rule on the

1    defendant's motion.

2         In addition to the facts and the evidence previously

3    discussed at this hearing and articulated on the record, I have

4    taken the following matters in mitigation and aggravation into

5    consideration both when ruling on the defendant's motion and

6    determining the sentence I will impose in this case.  I am

7    going to start with matters in mitigation.

8         In my view a significant factor in mitigation in this

9    case is the fact that there's no evidence in the record that

10   any of the images created by this defendant were distributed by

11   her to anyone other than her codefendant, nor is there any

12   evidence that Ms. Larsen produced these videos or images

13   intending to sell, distribute or otherwise disseminate them to

14   third parties in general or the child pornography world in

15   particular.

16        There is no evidence that this defendant was involved

17   with any child pornography community such as through

18   participation in Internet chat rooms through which participants

19   often discuss the pornographic material that they have

20   exchanged and made available on the Internet.  And I take

21   judicial notice of the fact that such participation is in fact

22   an aggravating factor under the Guidelines.

23        In mitigation as well is the fact that the defendant

24   did not possess, collect or distribute child pornography videos

25   or pictures prior to the actions in which she engaged in this

1    case.

2           As previously noted, Ms. Larsen has no criminal

3    history.  She has been assessed zero criminal history points by

4    the probation officer, she has no juvenile criminal

5    adjudications, she has no pending criminal charges and she is

6    before me on her first felony conviction.

7           And, finally, there is no indication in the record the

8    defendant has engaged in any conduct while she has been in

9    pretrial detention that is in violation of any of the custodial

10   facility rules or regulations.

11          With regard to matters in aggravation, the matter of

12   greatest aggravation in this case is the very nature of the

13   crime itself.  The criminal course of conduct in which the two

14   defendants so cavalierly and enthusiastically engaged in this

15   case is the most horrific, abominable, heinous and depraved

16   conduct I have seen in my 62 months on this bench as a federal

17   judge.  It's cases like this one that cause me to question the

18   wisdom of my decision to leave my comfortable practice as a

19   civil rights and employment litigator where I never had to deal

20   with or even know about cases like this one.

21          But I am here and I took an oath to do justice, as

22   best as I can divine what that justice should be in any

23   particular case, and that's what I fully intend to do here.

24          In significant aggravation in this case in my mind is

25   the fact that the defendant exploited, not one or two, but

1    three different minor victims, two of whom were only two years

2    old and still in diapers at the time these heinous crimes were

3    inflicted upon them.

4           Also in significant aggravation is the horrible fact

5    that the young victims in this case were forever robbed of

6    their innocence and their childhood and were caused to suffer

7    truly unimaginable mental suffering.  The human cost of this

8    type of exploitative activity is truly difficult to imagine or

9    calculate.

10          One of the best attempts to put the human cost of this

11   unfathomable conduct into words that I have read in the record

12   of this case comes from the *guardian ad litem* for the

13   defendant's children.  She has gone on the record to state,

14   quote, "As for the children, they have experienced such

15   emotional and physical pain that they are bonded, almost

16   cemented, to one another through this trauma.  When minor No. 2

17   would leave for school when Minor No. 1 was not awake when she

18   left, he would cry inconsolably thinking she was never coming

19   back.  For these children the nightmare with will never be

20   over," end quote.

21          In addition, the guardian has observed that Minor

22   No. 1, quote, has nightmares that he cannot express, but is

23   working on in his young coping skills in play therapy.  He will

24   have the most lasting effects as a result of Ms. Larsen's

25   actions, end quote.

1        In aggravation is also the fact that although the

2    defendant claimed to her psychologist that her sexual interests

3    were limited solely to adult males, and that she denied that

4    she was sexually aroused by molesting the children, I agree,

5    however, with the government that despite these claims, the

6    videos and Skype chats tell a different story.  In them,

7    according to the narrative descriptions of these videos, which

8    the government and their counsel, Ms. Smith, as an officer of

9    the Court, has presented to me, and I take at face value as

10   truthful, that the defendant sounds and acts like she is

11   enjoying herself.  She is actively, intentionally and

12   repeatedly molesting her son.  In the Skype chats Mr. Holt is

13   sending her sexually explicit pictures of the video -- of the

14   children.  And Ms. Larsen says that she is enjoying herself in

15   these texts she writes to Mr. Holt at the very same time that

16   she is sexually abusing her son.

17       Another video shows the defendant having her son use

18   her vibrator on her and in which she is clearly sexually

19   aroused and moaning audibly.

20       In aggravation in my view also is the fact that on

21   several occasions, or at least two occasions, through outright

22   lies and deceit she convinced her brother to allow her

23   two-year-old son, her own nephew and Minor No. 3 in this case

24   to go to the defendant's house so she could provide the child

25   to Mr. Holt so he could sexually molest and assault them, and

1   she could film the abuse.

2           Also in aggravation in my view are the ways in which

3   Ms. Larsen has responded to being charged and convicted with

4   the instant offense.  At various points in time, when speaking

5   to law enforcement, with the probation officer and the

6   psychologist, her approach and response to the criminal charges

7   brought against her has been to a tempt to diminish her

8   personal culpability for her crime, to attempt to minimize the

9   severity of her crime and to minimize and even deny the horror

10  and harm she has inflicted upon her own children and nephew.

11          I am very disturbed by the fact that Ms. Larsen has

12  consistently failed to admit her own conduct, which was caught

13  on videos or photos, thus, conclusively establishing that she

14  has lied to law enforcement, her psychologist and to the

15  probation officer.

16          For example, Ms. Larsen told the Federal Bureau of

17  Investigation that she had never fully performed oral sex on

18  her son, but that she, quote, only kissed him between his legs,

19  end quote.  That statement is flatly contradicted by a Skype

20  chat she had with Mr. Holt in which she tells him how she had

21  been -- how she had been sucking on her son.

22          Another video depicts the defendant anally penetrating

23  her son with her fingers and fondling his genitals.

24          She continues to blame her codefendant as the sole

25  culpable party to this horrible crime.  While Mr. Holt is a

1   child pedophile and a monstrous criminal in his own right, what

2   this defendant does not even appear to this moment to fully

3   comprehend, that her children and her nephew would not have

4   been put in harm's way of this individual had it not been for

5   her own conduct.

6        So I have clearly concluded that the matters in

7   aggravation in this case far outweigh the matters in

8   mitigation.

9        I am, however, still struggling with the issue of the

10  length of the appropriate sentence in this case.  Even

11  considering all the horrific factors that I have outlined in

12  this case, I am still bound by the statute and my oath to

13  consider what is a sufficient but not greater than necessary

14  sentence to effect the statutory goals of sentencing.

15       I have taken into account various matters in that

16  regard with respect for example -- with respect to whether 80

17  years would be sufficient, but not greater than necessary,

18  whether 70 or 60.

19       Put into perspective the fact -- the issue of marginal

20  deterrence, which I think I've discussed with Ms. Smith in the

21  past, and the Seventh Circuit's decision in that case that

22  advises judges to consider the issue of marginal deterrence.

23       And I am going to quote from **Newsom**, because I think

24  it's very instructive and very illuminating, at 402 F.3d 780,

25  at 785-786.  The Seventh Circuit writes:  Those who think that

1    the idea of marginal deterrence should play some part in a

2    criminal sentence, that is, that the harshest sentences should

3    be reserved for the most culpable behavior, might find little

4    room left above the victims -- the defendant's sentence for a

5    child abuser who physically harms his victim, who abuses many

6    different children or who in other ways inflicts greater harm

7    on his victims and society.

8            As horrible as the conduct in this case has been, I

9    can imagine, unfortunately, and the case may come on the U.S.

10   attorney's desk tomorrow, a case that's even worse than this

11   one.  So as a result I have decided to grant in part the

12   defendant's motion for a downward variant sentence.

13           I intend to sentence the defendant to a period of

14   imprisonment of 180 months, or 15 years, on Count 1; 180

15   months, or 15 years, on Count 2, to be served consecutive to

16   Count 1; and 180 months, or 15 years, on Count 3, to run

17   consecutive to the custodial terms I am imposing on Counts 1

18   and 2; for a total custodial term of 540 months, or 45 years,

19   to be followed by a lifetime term of supervised release.

20           Given the defendant's lack of financial means, I

21   intend to waive payment of any fine other than the special

22   assessment of $300.

23           Given the dissimilarity of this defendant in terms of

24   her history and characteristics and the nature of her

25   involvement in the underlying offense, I find that any

1    disparity between her sentence and the sentences received by

2    similarly situated defendants convicted of this offense will

3    not be unwarranted.

4         Before I impose sentence I will give counsel a final

5    opportunity to make any record they believe appropriate.

6         Ms. Smith.

7         MS. SMITH:  No, your Honor.  Just one thing.  And I am

8    sure the Court has done the math, I just did it quickly, which

9    is that she will be approximately 66 years old upon release.

10   One of the things that the government would ask is that the

11   defendant not have contact with her minor children unless they

12   instigate the contact.  There is a case, **U.S. vs. Burns**, that

13   establishes the Court in order to do that must make findings

14   that there's compelled justification for that and that the

15   defendant may cause or be of danger to her own minor children.

16        THE COURT:  All right.  Well, Ms. Paul recommended

17   that as a term of special condition of supervised release.  But

18   let me just make sure I understand what you are saying.  Is it

19   you want it as a special condition of supervised release that

20   she never for the rest of her life contact her children or only

21   until they are 18, without them initiating the contact?

22        MS. SMITH:  Your Honor, I think the former, that she

23   shouldn't -- well, I am not sure if it was the former, but she

24   shouldn't have contact with them even if they reach majority

25   age unless they initiate the contact.  I am sure that's not a

1    precedented term of supervised release, but I think it's one

2    that's appropriate here, that if the children upon their

3    adulthood want to reach out to her, they can certainly do that,

4    but she should be banned from reaching out to them on her own.

5              THE COURT:  Ms. Stimson, can I hear your response.

6              MS. STIMSON:  I am just thinking how -- I understand

7    that as a term of supervised release, but there will be a

8    significant number of years after they turn 18 before she

9    begins on supervised release.

10             THE COURT:  Right.

11             MS. STIMSON:  So I don't know how that could be

12   imposed legally.  Definitely prior to 18, I understand how that

13   could be imposed legally, but once they are adults I don't know

14   how we would do that.

15             THE COURT:  All right.  Well, first of all, we're

16   talking about special conditions of supervised release.

17   Actually, you raise a good point.  She won't be on supervised

18   release until she serves her custodial term.

19             So, Ms. Smith, is there some way that I can order that

20   she not initiate contact with her children while she's in

21   custody?

22             MS. SMITH:  I believe it can, your Honor, using the

23   Court's inherent powers of equity, etc.  It would be similar to

24   an order of protection for a witness.  And I believe that the

25   Court has the ability to order that she not affirmatively reach

1    out to her children or have contact with her children without

2    it being a term of supervised release, then of course the Court

3    has the discretion based on its own findings to impose several

4    conditions of supervised release, including who she may have

5    contact with once she is released.

6           MS. STIMSON:  Ms. Larsen does not object.

7           THE COURT:  And that's at any time until she's --

8    while she's in custody?

9           MS. STIMSON:  Yes.

10          THE COURT:  What about when she's on supervised

11   release?  Does she object to having -- that she will not be

12   able to initiate contact with her children, who will be middle

13   aged at that point, without the initiation coming from them?

14          MS. STIMSON:  She does not object to that.

15          THE COURT:  All right.  Based on the lack of

16   objection, I am going to grant the government's motion.

17          How about from the defendant, any final record you

18   wish to make, Ms. Stimson, before I impose sentence?

19          MS. STIMSON:  No, your Honor.

20          THE COURT:  All right.  I find that a Guideline

21   sentence in this case would be greater than necessary to

22   accomplish the goals of sentencing and will instead impose a

23   sentence below the Guideline sentence.

24          In addition, I find that the sentence I will impose in

25   this case reflects the seriousness of the offense, affords

1    adequate deterrence to future criminal conduct and will protect

2    the public from further crimes of this defendant.

3           Accordingly, pursuant to the Sentencing Reform Act of

4    1984, it is the judgment of this Court that the defendant,

5    Jordain Larsen, be committed to the custody of the Bureau of

6    Prisons to be imprisoned for a term of 180 months, or 15 years,

7    on Count 1; 180 months, or 15 years, on Count 2, to be served

8    consecutive to Count 1; and 180 months, or 15 years, on

9    Count 3, to run consecutive to the custodial terms I am

10   imposing on Counts 1 and 2; for a total custodial term of 540

11   months or 45 years.

12          In serving this term of incarceration, the Court

13   recommends that the director of the Bureau of Prisons give the

14   defendant full credit for her time served in pretrial

15   detention.

16          Given the defendant's -- I am sorry, the government's

17   motion, which I have granted, I am ordering that the Court's

18   judgment include a provision that during the period of her

19   incarceration that the defendant shall not have -- shall not

20   initiate any communication with her children.

21          Now to clarify, Ms. Smith, did you mean just her

22   children or with all three victims?

23          MS. SMITH:  Thank you, your Honor.  All three.

24          THE COURT:  All right.  Any objection?

25          MS. STIMSON:  No.

1        THE COURT:  All right.  It is the order of this Court,

2   that will be included in the judgment, that the defendant

3   during her period of incarceration shall not initiate any

4   communication with any of the three victims in this case.

5        Upon her release from imprisonment the defendant shall

6   be placed on supervised release for the remainder of her

7   natural life.

8        Within 72 hours of release from the custody of the

9   Bureau of Prisons, the defendant shall report in person to the

10  probation office in the district to which she is released.

11       While on supervised release the defendant shall not

12  commit another federal, state or local crime, shall not possess

13  a firearm, as defined in 18, United States Code, Section 921,

14  and shall comply with the standard conditions that have been

15  adopted by this Court.

16       The defendant shall not unlawfully possess and she

17  shall refrain from unlawfully using a controlled substance.

18       The defendant shall submit to one drug test within 15

19  days after release on supervised release and two periodic tests

20  thereafter.

21       The defendant shall cooperate in the collection of DNA

22  as directed by the probation officer.

23       The defendant shall comply with the requirements of

24  the Sex Offender Registration and Notification Act as directed

25  by the probation officer -- as directed by the probation

1   officer, the Bureau of Prisons or any state sex offender

2   registration agency in which she resides, works, is a student

3   or was convicted of a qualifying offense.

4           The Court finds that the following special conditions

5   of supervision are determined to be reasonably related to the

6   factors enumerated in Sections 3553(a) and 3583(d); and,

7   further, based on the nature and circumstances of the offense

8   and the history and characteristics of this particular

9   defendant, the following conditions do not constitute a greater

10  deprivation of liberty than reasonably necessary to accomplish

11  the goals of sentencing:

12          Special condition No. 1.

13          The defendant shall participate in and successfully

14  complete a program of testing and/or treatment for substance

15  abuse as approved by the probation officer until such time as

16  the defendant is released from the program by the probation

17  officer.  The defendant shall abstain from the use of alcohol

18  or other intoxicants during the course of treatment and shall

19  pay the cost of treatment as directed by the probation officer.

20          Special condition No. 2.

21          The defendant shall participate in and successfully

22  complete a program of mental health treatment as approved by

23  the probation officer until such time as the defendant is

24  released from the program by the probation officer.  The

25  defendant shall pay the cost of treatment as directed by the

probation officer.  The Court authorizes the probation officer
to release to the treatment agency all psychological reports
and/or the Presentence Report for continuity of treatment.

Special condition No. 3.

The defendant shall remain medication-compliant and
shall take all medications that are prescribed by her treating
healthcare provider.  The defendant shall cooperate with random
blood tests as requested by her treating healthcare provider
and/or the supervising probation officer to ensure that a
therapeutic level of her prescribed medications is maintained.

Special condition No. 4.

The defendant shall participate in and successfully
complete a program -- an approved program of sex offender
evaluation and treatment as directed by the probation officer,
which may include polygraph and visual reaction time measuring
instruments as determined to be therapeutically appropriate.
The defendant will be required to pay the costs of these
evaluations and treatment.  The defendant shall comply with the
rules and restrictions specified by the treatment agency.

Special condition No. 5.

The defendant's use of computers and Internet access
devices shall be limited to those the defendant requests to use
and which the probation officer authorizes.  The defendant
shall submit her person and any property, house, residence,
vehicle, papers, computer, other electronic communications or

1   data storage devices or media and effects to a search at any

2   time, with or without a warrant, by any law enforcement or

3   probation officer with reasonable suspicion concerning a

4   violation of a condition of supervised release or unlawful

5   conduct by the person and by any probation officer in the

6   lawful discharge of that officer's supervision functions.

7          Special condition No. 6.

8          The defendant shall allow the probation officer to

9   install software and hardware designed to monitor computer

10  activities on any computer by the defendant -- let me start

11  that sentence again.  The defendant shall allow the probation

12  officer to install software and hardware designed to monitor

13  computer activities on any computer the defendant is authorized

14  by the probation officer to use.  The software may record any

15  and all activity on the computer, including the capture of

16  keystrokes, application information, Internet use history,

17  e-mail correspondence and chat conversations.  A notice will be

18  placed on the computer at the time of installation to warn

19  others of the existence of the monitoring software on the

20  computer.  The defendant shall not attempt to remove, tamper

21  with, reverse-engineer or in any way circumvent the software or

22  hardware.

23         Special condition No. 7.

24         The defendant shall have no contact with any children

25  under the age of 18, including her own children, and shall not

1   attempt to have any contact except under circumstances ordered

2   by the Court and approved in advance and in writing by the

3   probation officer.  "Contact" includes correspondence, written

4   or verbal, telephone contact or any communication to a third

5   party.

6           Special condition No. 8.

7           The defendant shall not reside or be in a residence

8   with any children under the age of 18, including her own

9   children or any of the victims in this case, unless ordered by

10  the Court.

11          Special condition No. 9.

12          The defendant shall have no contact with any victim,

13  including correspondence, telephone contact or other

14  communications through a third party, except under

15  circumstances approved in advance and in writing by the

16  probation officer, and to be consistent with the custodial

17  period of her incarceration, unless that contact and

18  communication is initiated by the victims in this case.

19          One second.

20          Special condition No. 10.

21          The defendant must inform her probation officer of all

22  her significant relationships and may be required by the

23  probation officer to inform certain people of her present

24  offense and restrictions.

25          Special condition No. 11.

1          The defendant shall not be employed or participate in

2     any volunteer activity where she has contact with children

3     under the age of 18 except under circumstances approved in

4     advance and in writing by the probation officer.

5          The defendant shall pay a special assessment of $300,

6     which shall be due and payable immediately.

7          The Court finds that the defendant does not have the

8     ability to pay a fine, so the Court will waive the payment of

9     any fine in this case other than the special assessment.

10          Pursuant to Rule 32.2 of the Federal Rules of Criminal

11     Procedure and the defendant's admission to the forfeiture

12     allegation in the Information, the defendant shall forfeit to

13     the United States any and all real -- any and all property,

14     real or personal, derived from the proceeds from the instant

15     offense and as stipulated to in the Plea Agreement.

16          Now, Ms. Larsen, pursuant to the Plea Agreement you

17     entered into in this case, you waived the right to appeal your

18     conviction as well as the sentence I just imposed except in

19     very limited circumstances.  To the extent you retained a right

20     to file an appeal, I am advising you that should you wish to

21     file such an appeal, a notice of appeal must be filed with the

22     clerk of the Court within 14 days after entry of judgment or

23     the right to appeal will be lost.  If you are unable to afford

24     an attorney for an appeal, the Court will appoint one to

25     represent you.  If you are unable to afford the fees for filing

1    an appeal, you may file a request with the Court that such fees

2    be waived.

3              Is there anything further from the government at this

4    time?

5              MS. SMITH:  No thank you, your Honor.

6              THE COURT:  All right.  Thank you.

7              Anything further from the defendant?

8              MS. STIMSON:  No, your Honor.  Thank you.

9              THE COURT:  All right.

10             Anything further from the Probation Office?

11             THE PROBATION OFFICER:  No, your Honor.  Thank you.

12             THE COURT:  All right.  The defendant is remanded to

13   the custody of the United States Marshal.

14             Thank you.  That will be all.

15        (Proceedings concluded at 4:41 p.m.)

16                     **REPORTER'S CERTIFICATE**

17        I certify that the foregoing is a correct transcript from

18   the record of proceedings in the above-entitled matter.  Dated

19   at Denver, Colorado, this 27th day of April, 2016.

20

21                           _____

22                                s/Gwen Daniel

23

24

25